UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
TRANSATLANTIC LINES LLC,                :

      Plaintiff,                        :

        -v-                       :

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

      Defendant.
----------------------------------

17 Civ. 998 (JSR)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/20/17

JED S. RAKOFF, U.S.D.J.

This case concerns the validity of a decision made pursuant to a voluntary but somewhat unusual alternative dispute resolution ("ADR") process. Pursuant to that process, the Board of Directors of defendant American Steamship Owners Mutual Protection and Indemnity Association ("American Steamship") denied an appeal from a partial denial of insurance coverage to plaintiff TransAtlantic Lines LLC ("TransAtlantic") for certain of the losses arising out of a shipping accident. Before this Court, TransAtlantic challenges that decision, seeking de novo review of its underlying claims. By "bottom-line" order dated May 18, 2017, the Court granted American Steamship's motion for summary judgment upholding the ADR decision, denying discovery, and dismissing the complaint. See Order dated May 18, 2017, ECF No. 25. This Opinion and Order explains the reasons for those rulings and directs the entry of final judgment.

1

A court may grant summary judgment "only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). The court must "construe the evidence in the light most favorable to the [non-moving party], drawing all reasonable inferences and resolving all ambiguities in [its] favor." Id.

The relevant facts, undisputed except where noted, are as follows. American Steamship is a non-profit, mutual protection and indemnity insurance association that provides marine insurance. Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"), ECF No. 17, ¶ 1; Plaintiff's Statement of Disputed and Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Plf. 56.1"), ECF No. 20, ¶ 1. Because American Steamship is a mutual association, all its insureds – which are called "Members" - are also insurers. Def. 56.1 ¶ 5; Plf. 56.1 ¶ 5. Membership in American Steamship is governed both by insurance policies, called "Certificates of Entry," and by American Steamship's by-laws and rules.[1] Def. 56.1 ¶ 15; Plf. 56.1 ¶ 15.

---

[1] See 2013-2014 American Steamship Mutual Protection and Indemnity Association By-Laws ("By-Laws"), Ex. B to Declaration of George J. Tsimis ("Tsimis Decl."), ECF No. 15; Class I Protection & Indemnity Insurance ("American Steamship Rules" or the "Rules"), Ex. B to Tsimis Decl.; see also Def. 56.1 ¶ 20; Plf. 56.1 ¶ 20.

American Steamship provides what is known as protection and indemnity insurance, which requires Members to pay their defense costs in the first instance, and then to seek reimbursement from American Steamship. Def. 56.1 ¶¶ 6-7; Plf. 56.1 ¶¶ 6-7. The defendant's day-to-day claims-processing business is conducted by its Manager, Shipowners Claims Bureau, Inc. ("SCB"). Def. 56.1 ¶¶ 10-11; Plf. 56.1 ¶¶ 10-11. Thus, Members submit claims to SCB, which makes coverage decisions in the first instance. Def. 56.1 ¶ 13; Plf. 56.1 ¶ 13.

Under the Rules, a Member can "appeal" a denial of coverage to American Steamship's Board of Directors, which is principally composed of officers and representatives of American Steamship's Members. Def. 56.1 ¶¶ 9, 14, 35; Plf. 56.1 ¶¶ 9, 14, 35. The Rules provide that, to appeal a decision, a Member must submit a Notice of Appeal, a brief not to exceed 20 pages, and any supporting evidence. See Procedures for Board Adjudication of Differences or Disputes ("Adjudication Procedures"), App'x A to American Steamship Rules §§ 1, 5. SCB is required to respond in kind, and the Member is allowed a reply. Id. §§ 6-7. The appeal is considered at a regular meeting of the Board, which does not hold oral argument or otherwise allow in-person presentations from Members. Id. §§ 3, 10-11. In due course, but in no later than six months, the Board is required to issue a written decision adjudicating the appeal. Id. § 12. The Rules provide

that "[t]he decision of the Association's Board of Directors is intended to be final and binding," see American Steamship Rules 1.4.48(d), and that further review of the Board's decision may be had in federal court under an "arbitrary and capricious" standard, see Adjudication Procedures, Further Appeal, § E.

TransAtlantic was a Member of American Steamship from at least 2009 to 2013, during which time it purchased insurance for a barge called the GUANTANAMO BAY EXPRESS. Def. 56.1 ¶ 17; Plf. 56.1 ¶ 17. In February 2013, while that ship was undergoing maintenance, TransAtlantic chartered the ATLANTIC TRADER from non-party McAllister Towing Co. Inc. ("McAllister") and added that ship to its Certificate of Entry. Def. 56.1 ¶ 18; Plf. 56.1 ¶ 18.

On March 4, 2013, more than twenty shipping containers fell off the ATLANTIC TRADER into the sea, and other containers and cargo aboard were damaged. Def. 56.1 ¶ 23; Plf. 56.1 ¶ 23. This incident led to a lawsuit in the Southern District of Florida in which TransAtlantic sued Portus Stevedoring LLC ("Portus") for negligently loading the vessel. Def. 56.1 ¶ 24; Plf. 56.1 ¶ 24. Portus, in turn, brought claims against McAllister, alleging that it had provided an unseaworthy barge. Def. 56.1 ¶ 25; Plf. 56.1 ¶ 25. In April 2014, McAllister demanded that TransAtlantic defend it against Portus's claims pursuant to the charter contract. Def. 56.1 ¶ 26; Plf. 56.1 ¶ 26. McAllister's request

4

was denied under somewhat disputed circumstances discussed infra. Def. 56.1 ¶ 27; Plf. 56.1 ¶ 27. After McAllister prevailed against Portus in the Florida suit, it demanded that TransAtlantic reimburse its attorney's fees, and TransAtlantic paid McAllister $100,000 to settle this claim. Def. 56.1 ¶¶ 28-30; Plf. 56.1 ¶¶ 28-30.

On October 6, 2015, the district court in Florida, following a bench trial, found TransAtlantic 60% liable and Portus 40% liable for the shipping incident. See Declaration of Gudmundur Kjaernested in Opposition to Defendant's Motion for Summary Judgment ("Kjaernested Decl."), ECF No. 18, ¶ 30. The district court found that TransAtlantic incurred damages of $517,942.03. Id., Ex. E.

TransAtlantic submitted claims for the losses arising from the shipping incident to American Steamship. Def. 56.1 ¶ 31; Plf. 56.1 ¶ 31. SCB paid TransAtlantic's claims in the amount of $516,728.39 for TransAtlantic's "sue and labor" costs[2] and the costs of pursuing the suit against Portus, but rejected TransAtlantic's claims for (i) McAllister's attorney's fees, (ii) claims for losses of U.S. Government cargo, and (iii) costs TransAtlantic incurred in recovering perishable cargo. Def. 56.1

---

[2] "Sue and labor" expenses are "are sums spent by the insured or its representative in an effort to mitigate damage and loss once an accident has occurred." Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 461 F.2d 500, 503 (2d Cir. 1972).

¶¶ 32-33; Plf. 56.1 ¶¶ 32-33. On September 21, 2016 TransAtlantic filed a Notice of Appeal with the Board seeking review of SCB's denial of coverage. Def. 56.1 ¶ 34; Plf. 56.1 ¶ 34. The appeal was fully briefed on November 10, 2016. Def. 56.1 ¶ 38; Plf. 56.1 ¶ 38. On December 12, 2016, the Board issued a 22-page decision upholding SCB's denial of coverage. Def. 56.1 ¶ 41; Plf. 56.1 ¶ 41; see Directors' Decision, Ex. H to Tsimis Decl.

This suit challenging the Board's decision followed. See Complaint, ECF No. 1 On April 10, 2017, American Steamship moved for summary judgment upholding the Board's decision, denying discovery, and dismissing the complaint. See Memorandum of Law in Support of Defendant American Steamship Owners Mutual Protection and Indemnity Association, Inc.'s Motion for Summary Judgment ("Def. Mem."), ECF No. 14. On April 17, 2017, TransAtlantic filed papers opposing the defendant's motion. See Plaintiff TransAtlantic Lines LLC's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plf. Mem."), ECF No. 21. On May 2, 2017, American Steamship filed reply papers. See Reply Memorandum of Law in Further Support of Defendant American Steamship Owners Mutual Protection and Indemnity Association, Inc.'s Motion for Summary Judgment, ECF No. 22. The Court heard oral argument on May 5, 2017, and, as

noted, granted American Steamship's motion by "bottom-line" order on May 18, 2017.

The threshold issue is the applicable standard of review. TransAtlantic seeks de novo review of the denial of coverage, and thus brings various tort and contract claims against American Steamship, rather than a single challenge to the Board's decision. See Complaint ¶¶ 49-119. American Steamship argues that the deferential standard of review typically applied to ADR decisions applies here.

At least two courts in this district have treated American Steamship's Board hearings as ADR proceedings that are subject to a deferential standard of review. See, e.g., Progress Bulk Carriers v. Am. S.S. Owners Mutual Prot. & Indem. Ass'n, Inc., 939 F. Supp. 2d 422, 427-29 (S.D.N.Y. 2013), aff'd, 2 F. Supp. 3d 499 (S.D.N.Y. 2014). This Court agrees. American Steamship's hearings bear all the hallmarks of a voluntary ADR proceeding. The agreed-to rules governing challenges to SCB's initial coverage decisions refer to the Board's hearing as an "adjudication," see American Club Rules 1.4.48, specifically provide that the Board's decisions are "intended to be final and binding," id. 1.4.48(d), and provide for further review in federal court only under an "arbitrary and capricious" standard of review, see Adjudication Procedures, Further Appeal, § E.

TransAtlantic, tacitly conceding that Board hearings are, in form, an ADR proceeding, nonetheless argues that it is entitled to de novo review of the Board's decision because the hearing was fundamentally unfair. An ADR panel must "grant the parties a fundamentally fair hearing," but, by the same token, it "need not follow all the niceties observed by the federal courts." See Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), 500 F.2d 921, 923 (2d Cir. 1974). "Due process in arbitration means satisfying 'minimal requirements of fairness.'" McMahan & Co. v. Dunn Newfund I, Ltd., 656 N.Y.S.2d 620 (1st Dep't 1997) (quoting Ficek v. Southern Pac. Co., 338 F.2d 655, 657 (9th Cir. 1964)). "That standard is met when the parties have had adequate notice and opportunity to be heard by unbiased decision-makers." Id. Here, TransAtlantic argues that the Board hearing was fundamentally unfair for four reasons, all of which sound, ultimately, in bias.

First, TransAtlantic argues that the Board had a financial interest in the decision, rendering it an impermissibly biased decision-maker. As TransAtlantic sees it, this bias inheres in American Steamship's corporate structure and the ADR process it follows. Because Members act as both insureds and insurer, each Member has, on some level, a financial interest in seeing other Members' claims denied. And because the Board is composed

principally of officers of various Members, the Board itself likewise necessarily has an interest in the outcome of coverage decisions. TransAtlantic argues that this bias was even more acute than normal in this case because, by the time the Board heard TransAtlantic's appeal, TransAtlantic was no longer a Member, and the Board was therefore more likely to succumb to its supposed biases in favor of denying claims.

This argument ignores the fact that the supposed bias was one inherent in the ADR arrangement to which TransAtlantic voluntarily agreed when it joined the Association. See, e.g., Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n, 820 F.3d 527, 548 (2d Cir. 2016) ("However, arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."); Westinghouse Elec. Corp. v. N.Y. City Transit Auth., 82 N.Y.2d 47, 52-56 (1993) (upholding ADR scheme in which an officer of one of the parties acted as arbitrator). This, then, is totally unlike a situation where an individual arbitrator has a concealed bias. See, e.g., Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia, 761 F. Supp. 293, 294 (S.D.N.Y.), aff'd without opinion sub nom. Sun Ref. v. Statheros Shipping, 948 F.2d 1277 (2d Cir. 1991). It is, instead, an attack on the very ADR procedure to which TransAtlantic knowingly and voluntarily agreed. Nor does

the fact that TransAtlantic was no longer a Member when its claim was actually adjudicated by the Board change this result, because TransAtlantic agreed that these procedures would apply to claims that arose during the relevant period.

Implicitly recognizing this defect, TransAtlantic denies, in passing, that it "agree[d] to have its claims finally decided by a tribunal whose members have a financial interest in the outcome." Plf. Mem. at 7. This argument is frivolous. In every conceivable sense, TransAtlantic did, in fact, agree to participate in the Board hearing with knowledge that Board members arguably would have some indirect interest in the outcome: by procuring the policy, by submitting a claim to SCB, by participating in the appeal to the Board, and so forth. And there is no contention, for example, that American Steamship somehow fraudulently concealed the rules setting forth the ADR proceeding at issue in this case. TransAtlantic's attempt to transform its dissatisfaction with the results of the hearing into an argument that it never agreed to the procedures it in fact followed without protest borders on the frivolous.

Second, TransAtlantic argues that American Steamship's ADR procedure, under which Board members, most of whom are officers or representatives of other Members, act as an ADR panel, violated the American Steamship by-law prohibiting directors from "act[ing] upon any claim against the Association in which

he or any corporation of which he is an officer, director, employee or stockholder, is interested." See By-Laws, Art. II, § 5. However, given the very nature of the Board appeal procedures, this provision inherently only disqualifies Members from acting on claims involving their own companies. Otherwise, the provision would effectively mean that each and every proceeding would violate the By-Laws, and would thus invalidate all Board adjudications. (Moreover, even under TransAtlantic's erroneous reading of this by-law, TransAtlantic nonetheless agreed to proceed before a panel supposedly acting ultra vires, and cannot now complain about it. See Nat'l Football League, 820 F.3d at 548.)

Third, TransAtlantic argues that it is "unlikely" that the Board meaningfully considered TransAtlantic's appeal, because the claim was adjudicated at a regular Board meeting without oral argument. See Plf. Mem. at 8. TransAtlantic also darkly suggests — without any factual support — that the decision might have been written by SCB, the "appellee" which denied the claim in the first instance. This argument is meritless. An ADR panel "need not follow all the niceties observed by the federal courts," see Bell Aerospace, 500 F.2d at 923, and, even in federal court, parties to civil disputes are not guaranteed an in-court oral argument. Moreover, the fact that the Board issued a 22-page decision a month after hearing the appeal strongly

suggests that the Board's consideration was, if anything, conscientious and thorough. As for TransAtlantic's suggestions that there may have been improper communications between SCB and the Board, or that SCB wrote the Board's decision, TransAtlantic offers no basis for these allegations other than sheer speculation.

Fourth, and finally, TransAtlantic, pointing to the rules governing mediators in this district, argues that the Board members may not have taken an oath of impartiality and failed to disclose their financial or personal interests. See United States District Court for the Southern District of New York Procedures of the Mediation Program (Dec. 9, 2013) ¶ 12(b). This argument fails, again, because TransAtlantic entered an agreement that made no provision for either of these items, and because they are, at best, the kind of niceties that ADR procedures need not provide. See Bell Aerospace, 500 F.2d at 923.[3]

_____

[3] Even the cases cited by TransAtlantic itself illustrate why its fundamental fairness argument falls short. For example, in International Union, United Mine Workers of America v. Marrowbone Development Co., 232 F.3d 383, 390 (4th Cir. 2000), the Fourth Circuit vacated an award where "the arbitrator issued his award without ever holding [a full arbitration] hearing or affording the Union the opportunity to present the evidence it had been prepared to offer at the abbreviated February hearing." Even if Marrowbone Development were binding on this Court – and it is not – TransAtlantic plainly received fuller and fairer process than the litigant in that case, because TransAtlantic received a full paper hearing in which it submitted all the

Separately, TransAtlantic's "fundamental fairness" argument also fails for the independent reason that TransAtlantic was aware of the supposedly unfair nature of the hearing to which it now objects, but failed to raise this argument before the Board. See Piller v. Schwimmer, 22 N.Y.S.3d 572, 574 (2nd Dep't 2016). ("[W]here a party becomes aware of a relationship between an arbitrator and the other party or to the matters in dispute that could lead to bias, if the party continues to participate in the arbitration, the party has waived his or her right to object to the award on this ground."). TransAtlantic's argument that it is excused from raising these objections because it viewed American Steamship's appeal requirement, not as creating a valid ADR proceeding, but as a condition precedent to bringing a lawsuit in federal court, has no merit. See Plf. Mem. at 9 n.5. As explained above, the Board hearing was plainly an ADR proceeding, and TransAtlantic cannot avoid that through a boilerplate reservation of rights. See Progress Bulk Carriers, 939 F. Supp. 2d at 427-28 (rejecting condition precedent argument). Having failed to lodge its fundamental fairness protests to the Board, TransAtlantic waived its right to do so before this Court.

---

evidence it desired, following which the Board carefully considered and rejected its arguments.

Turning to the next main issue, TransAtlantic argues that the ADR decision should be reviewed de novo because it violated public policy. Since the ADR arrangement here is contractual, this issue is governed by state law, specifically, as the parties agree, New York law. Under New York law, "the scope of the public policy exception to an arbitrator's power to resolve disputes is extremely narrow." In re United Fed'n of Teachers, Local 2, AFT, AFL-CIO v. Bd. of Educ. Of City Sch. Dist. of the City of N.Y., 1 N.Y.3d 72, 80 (2003). To determine whether an ADR award violates public policy, courts apply a two-prong test:

> First, where a court can conclude without engaging in any extended factfinding or legal analysis that a law prohibits, in an absolute sense, the particular matters to be decided by arbitration, an arbitrator cannot act. Second, an arbitrator cannot issue an award where the award itself violates a well-defined constitutional, statutory or common law of this State.

Id. (internal quotation marks, ellipses, and alterations, and citation omitted). TransAtlantic argues that three features of the Board's decision violate public policy: American Steamship's endorsement of conflicted counsel, in violation of attorney ethics rules; the application of an anti-waiver provision in the American Steamship Rules; and American Steamship's own "conflict of interest."

Beginning with attorney ethics, TransAtlantic argues that the ADR decision endorsed a violation of ethics rules requiring counsel to be independent and unconflicted when paid by a third

14

party to represent a client — the typical insurer/insured relationship. See New York Professional Rule of Conduct 1.8(f). In particular, TransAtlantic complains that its attorney in the Florida action, supposedly acting at American Steamship's direction and for American Steamship's benefit, improperly declined to assume the defense of McAllister, even though American Steamship knew that TransAtlantic would likely be found responsible for that defense. Then, after TransAtlantic ultimately settled McAllister's attorney's fees claim for $100,000, American Steamship denied the claim.[4]

This argument is meritless. TransAtlantic points to no statute that outlaws resolving disputes of this nature through an ADR proceeding, the first prong of the public policy vacatur test. See Cty. of Chautauqua v. Civil Serv. Emps. Ass'n, Local 100, AFSCME, AFL-CIO, Cty. of Chautauqua Unit 6300, Chautauqua Cty. Local 807, 8 N.Y.3d 513, 519 (2007) ("Put differently, a court must stay arbitration where it can conclude, upon examining the parties' contract and the implicated statute on their face, that the granting of any relief would violate public

---

[4] The extent of American Steamship's involvement in the decision not to defend McAllister is contested. American Steamship maintains that it was merely kept abreast of TransAtlantic's decision, while TransAtlantic claims that American Steamship made the call. See Def. 56.1 ¶ 27; Plf. 56.1 ¶ 27. However, this dispute does not preclude summary judgment, because, as explained infra, there is no public policy violation even on American Steamship's version of the facts.

policy." (emphasis in original) (internal quotation marks omitted)).

TransAtlantic also fails to show that the award itself "violates a well-defined constitutional, statutory or common law" of New York State, the second prong of the public policy vacatur test. See United Fed'n of Teachers, 1 N.Y.3d at 80. The source of TransAtlantic's proffered public policy in favor of independent counsel is either the Restatement (Third) of the Law Governing Lawyers or the New York Professional Rules of Ethics. See Plf. Mem. at 16. Neither is the kind of authority that can, in principle, support a public policy vacatur under the New York Court of Appeals' articulation of the standard. Indeed, one New York court has upheld an arbitration award, over a public policy objection, to an attorney in a dissolved law firm, even though the attorney violated the Rules of Professional Conduct before the firm was dissolved. See Wittels v. Sanford, 29 N.Y.S.3d 266 (1st Dep't 2016). If ethics rules violations are not a ground to overturn arbitration awards in favor of attorneys who violated them, then, a fortiori, they are not a ground to overturn arbitration awards in favor of a party that is not even bound by those rules but that arguably induced a violation.

For TransAtlantic's next alleged public policy violation, TransAtlantic protests American Steamship's reliance on its anti-waiver provision to deny the attorney's fees claim. The

anti-waiver provision acts as a permanent reservation of American Steamship's right to deny coverage for any reason permitted by the contract or the Rules.[5] But, again, TransAtlantic fails to identify any statute or case invalidating an anti-waiver provision on public policy grounds, or any other principle of law even arguably suggesting that a public policy vacatur is appropriate when an ADR decision enforces an anti-waiver provision. Cf. Slayko v. Sec. Mut. Ins. Co., 98 N.Y.2d 289, 295 (2002) ("[W]hen statutes and Insurance Department regulations are silent, we are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy.").

Finally, TransAtlantic also suggests that American Steamship itself had a conflict of interest connected to the U.S. Government cargo claims brought against TransAtlantic, viz., that it was in American Steamship's interest to delay

---

[5] See American Steamship Rules 1.4.38 ("No act, omission, course of dealing, forbearance, delay or indulgence by the Association in enforcing any of the terms of the contract of insurance issued to the Member by the Association shall prejudice or affect the rights and remedies of the Association under the contract of insurance, and no such occurrence shall be treated as any evidence of waiver of the Association's rights thereunder or result in any form of estoppel as to such rights and remedies, nor shall any waiver of a breach by the Member of such contract operate as a waiver or estoppel with respect to any subsequent breach thereof. The Association shall at all times and without notice be entitled to insist on the strict application and enforcement of all of the terms of the contract of insurance it issued to the Member.").

resolving them until the limitations period expired, whereas it was in TransAtlantic's interest to expeditiously resolve them. However, this "conflict" does not even arguably implicate an attorney's ethical duties — the sole public policy grounded in any authority that TransAtlantic identifies in support of vacatur — and, accordingly, likewise cannot support vacatur.

As the penultimate issue, TransAtlantic argues that, at a minimum, the Court should defer ruling on American Steamship's motion for summary judgment and allow discovery into the Board hearing, because "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Hellstrom v. U.S. Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000); see also Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."). Here, TransAtlantic argues that it has advanced a sufficient claim for bias and unfairness in the ADR proceeding to warrant discovery.

However, TransAtlantic misapprehends the law governing the availability of post-ADR discovery. In post-ADR cases, courts take a much narrower view of discovery than set forth in

Hellstrom, and, indeed, "[t]he district court has discretion to deny discovery in a proceeding to confirm an arbitral award." Lyeth v. Chrysler Corp., 929 F.2d 891, 898 (2d Cir. 1991). Thus, in general, "discovery in a post-arbitration judicial proceeding to confirm or vacate . . . is available only in limited circumstances, where relevant and necessary to the determination of an issue raised by such an application." Frere v. Orthofix, Inc., No. 99-cv-4049 (RMB)(MHD), No. 00-cv-1968 (RMB)(MHD), 2000 WL 1789641, at *4 (S.D.N.Y. Dec. 6, 2000). In order to take discovery from the ADR panel itself, a litigant must present "clear evidence of impropriety," such as bias or corruption. See Matter of Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G., 579 F.2d 691, 702 (2d Cir. 1978). Applying these principles, courts in this district have denied post-ADR discovery outright. See, e.g., Schwartz v. Merrill Lynch & Co., Inc., No. 09-cv-900 (WHP), 2009 WL 2496028 (S.D.N.Y. Aug. 5, 2009).

Here, TransAtlantic seeks to take discovery relating to "the fundamental unfairness of the Board's consideration of its appeal." See Declaration of Mark R. Zancolli in Opposition to Defendant's Motion for Summary Judgment, ECF No. 19, ¶¶ 7-8. TransAtlantic focuses on the same facets of the Board's composition and decision-making process that it cited as evidence of bias, such as the extent of each Board member's

interest in TransAtlantic's appeal. However, as explained above, TransAtlantic has raised no colorable argument that there was any impermissible bias. Having agreed to the challenged features ahead of time, TransAtlantic cannot now take discovery into whether they were unfair.

TransAtlantic's other bases for obtaining discovery are purely speculative. TransAtlantic wishes to know, for example, whether there were improper communications between the Board and SCB, and whether the Board spent (in TransAtlantic's view) an adequate amount of time considering its appeal. But there is nothing to suggest any untoward communications, nor anything to suggest a review so cursory as to be fundamentally unfair. Indeed, as noted supra, the fact that the Board issued a 22-page decision carefully considering TransAtlantic's arguments strongly suggests the opposite. Cf. Lyeth, 929 F.2d at 899 ("As for the discovery requests directed at the [American Arbitration Association], we believe that the district court did not err when it observed that Chrysler was simply 'engaging in a fishing expedition in an attempt to determine if there is some basis, however farfetched, to prosecute a claim of bias.'").

Accordingly, discovery is denied.

Finally, TransAtlantic argues that the Board's denial of coverage fails under the applicable deferential standard of review. In general, decisions issued pursuant to voluntary ADR

proceedings are upheld unless there is "proof of fraud, corruption, or other misconduct." Motor Vehicle Acc. Indemnification Corp. v. Aetna Cas. & Sur. Co., 89 N.Y.2d 214, 223 (1996). If this were the standard here, TransAtlantic's argument would have to be rejected out of hand, since, for the reasons discussed supra, there is no adequate basis here for suggesting fraud, corruption, or other misconduct.

However, the American Steamship Rules provide for a modestly less deferential standard of review, which, as the parties agree, the Court must therefore apply. See Def. Mem. at 21-25; Plf. Mem. at 18-25. Specifically, a decision of the Board "may be modified by a court only upon a finding that the decision was arbitrary and capricious, that is, without reason, an issue on which the Member shall have the burden of proof." See Adjudication Procedures, Further Appeal § E.

TransAtlantic first challenges the Board's denial of TransAtlantic's claim for McAllister's attorney's fees in the Florida action. The Board denied coverage for two reasons, neither of which is arbitrary and capricious.

The Board first denied coverage because, under the insurance policy, the attorney's fees were not within the narrow coverage provided to McAllister under the so-called "misdirected arrow" clause, which reads as follows:

> Notwithstanding the fact that McAllister Towing Co. Inc.
> are [sic] hereby named as additional assured in this
> Certificate of Entry, the cover of the Association will
> only extend insofar as they [sic] may be found liable to
> pay in the first instance for loss or damage which is
> properly the responsibility of TransAtlantic Lines Inc.
> . . . .

See Certificate of Entry, Ex. A to Kjaernested Decl., at 7. The

Board, relying on a decision from this district interpreting

substantially the same clause, understood it to mean that

McAllister is covered only "to the extent that [McAllister] is

held responsible for loss or damage caused by [TransAtlantic]."

See Directors' Decision at 9 (quoting Trident Int'l Ltd. v. Am.

S.S. Owners Mutual Prot. & Indemn. Ass'n, Inc., No. 06-cv-6136

(PKL), 2008 WL 2498239, at *5 (S.D.N.Y. June 19, 2008) (emphasis

added), aff'd, 331 F. App'x 77 (2d Cir. 2009) (summary order)).

The Board thus denied coverage because the attorney's fees arose

in a suit where McAllister was sued, not for loss or damage

caused by TransAtlantic, but for providing an unseaworthy

vessel, which, if true, was caused by McAllister alone.

The Board's decision was not arbitrary and capricious.

TransAtlantic's argument that the misdirected arrow clause –

which covers claims that are "properly the responsibility of

TransAtlantic Lines Inc.," see Certificate of Entry at 7 –

covers instances where a party has contractually assumed

responsibility for a loss, even if the party did not cause the

loss, may be colorable. Nonetheless, the Board's decision to the

contrary, which simply applied persuasive authority from a federal district decision affirmed by the court of appeals, is, plainly, neither arbitrary nor capricious.

Moreover, the Board also rejected the attorney's fees claim because the claim arose both from TransAtlantic's breach of a contractual duty to obtain coverage for McAllister, and from TransAtlantic's obligation to cover the fees pursuant to a contract with a third party. See Directors' Decisions at 10; see also American Club Rules 3.2.4 (excluding from coverage claims arising from "[c]ancellation or breach of any charter or contract"); id. 3.2.8 (excluding "[l]iabilities, costs and expenses which would not have arisen but for the terms of a contract or indemnity entered into by a Member"). This decision was not arbitrary and capricious, but was, instead, a straightforward application of the applicable Rules. TransAtlantic, tacitly conceding that the two exclusions relied on by the Board apply to its claim, instead faults the Board's decision because American Steamship was purportedly involved in the decision to decline to defend McAllister. However, that simply has no bearing on the applicability of the two exclusions or the ultimate soundness of the Board's decision, which, as noted, was not "without reason."

TransAtlantic next challenges the Board's denial of a claim arising out of its loss of U.S. Government cargo. The Board

denied coverage because TransAtlantic agreed to transport government cargo on terms less favorable than required under the U.S. Carriage of Goods by Sea Act ("COGSA") by granting the government a six-year limitations period, whereas COGSA imposes a one-year period. Directors' Decision at 17-19; see American Steamship Rules 2.8. ("[T]here shall be no recovery from the Association in respect of liabilities which would not have been incurred or sums which would not have been payable by the Member if the cargo . . . had been carried on terms no less favorable to the Member than . . . the U.S. Carriage of Goods by Sea Act . . . .").

This decision was not arbitrary and capricious. In protesting the Board's decision, TransAtlantic focuses on the fact that some courts, faced with COGSA claims brought by the United States, have applied the catch-all six-year limitations period for such claims rather than the one-year period provided in COGSA itself. See, e.g., United States v. Gulf Puerto Rico Lines, Inc., 492 F.2d 1249, 1251 (1st Cir. 1974). TransAtlantic thus argues that, by granting a six-year limitations period to the government, it did not treat the government more favorably than COGSA, but in keeping with COGSA. However, while TransAtlantic's argument is not frivolous, the Board was not irrational to conclude that the Rules' reference to COGSA meant only the statute itself, and that the Rules did not also

incorporate a smattering of decisions interpreting the statute in non-obvious ways.

Finally, TransAtlantic challenges the Board's denial of a claim for approximately $43,000 in expenses TransAtlantic incurred in recovering perishable cargo following the shipping incident.[6] Under the Rules, American Steamship is entitled to be made whole for any claim it paid before a Member can recover from a third party. See American Steamship Rules 1.4.27 ("[T]he whole of any recovery from a third party in respect of that claim shall be credited and paid to the Association up to an amount corresponding with the sum paid by the Association together with any interest element on that sum comprised in the recovery . . . ."). The Board denied this claim because it found that the $43,000 represented a portion of the $517,000 in claims that American Steamship paid to TransAtlantic. Directors' Decisions at 19-21.

The Board's decision was not arbitrary and capricious. TransAtlantic argues that, because American Steamship supposedly never "paid a claim" on behalf of TransAtlantic for the perishable cargo recovery expenses, it was not entitled to keep the $43,000. This argument relies on the unstated premise that

_____

[6] The $43,000 represents Portus's share (40%) of the approximately $107,000 paid to various third parties to recover perishable cargo after the shipping incident.

the total perishable cargo expenses was somehow independent of the $517,000 that American Steamship paid to TransAtlantic in connection with the shipping incident. But it is not obvious why it would be independent, for the $43,000 was part of its total damages in the Florida action, which was submitted for coverage and largely paid by the defendant. The Board's decision denying this claim was not, therefore, "without reason," but was instead a straightforward application of the "made whole" provision.

For the foregoing reasons, this Court, on May 18, 2017, granted summary judgment in favor of defendant American Steamship. The Clerk of Court is now directed to enter final judgment dismissing the complaint and to close the case.

SO ORDERED.

Dated:  New York, NY
        May 28, 2017

JED S. RAKOFF, U.S.D.J.